

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,188

**ROBERT ALAN FRATTA, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL FROM CAUSE NO. 1195044
IN THE 230ᵀᴴ DISTRICT COURT
HARRIS COUNTY**

JOHNSON, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, PRICE, WOMACK, KEASLER, HERVEY, and ALCALA, JJ., joined. COCHRAN, J., did not participate.

### O P I N I O N

Appellant was convicted in April 1996 of a capital murder committed in November 1994. TEX. PENAL CODE ANN. § 19.03(a)(3). Based on the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge

sentenced appellant to death. Art. 37.071, § 2(g).[1]  This Court affirmed appellant's conviction and

sentence on direct appeal.  *Fratta v. State,* No. AP-72,437 (Tex. Crim. App. June 30, 1999) (not

designated for publication).  Subsequently, this Court denied relief on his Article 11.071 application

for a writ of habeas corpus.  *Ex parte Fratta,* No. WR-31,536-02 (Tex. Crim. App. Sept. 22, 2004)

(not designated for publication).  Appellant then filed an application for a writ of habeas corpus in

federal district court, where relief was granted based on violations of the Confrontation Clause of

the Sixth Amendment to the Constitution of the United States.  *Fratta v. Quarterman,* No. H-05-

3392, 2007 U.S. Dist. LEXIS 72705 (S.D. Tex. Sept. 28, 2007) (not designated for publication). The

United States Court of Appeals for the Fifth Circuit affirmed the district court's judgment.  *Fratta*

*v. Quarterman,* 536 F.3d 485, 488 (5th Cir. Tex. 2008).

Following a new trial in May 2009, appellant was again convicted of capital murder.  Based

on the jury's answers to the special issues, on June 1, 2009, the trial court again sentenced appellant

to death.  Direct appeal to this Court is mandatory.  Art. 37.071, § 2(h).  After reviewing appellant's

thirty-two points of error, we find them to be without merit.[2]  Consequently, we affirm the trial

court's judgment and sentence of death.

### Statement of Facts

Appellant does not challenge the sufficiency of the evidence of guilt.  However, a brief

statement of the facts is helpful for an understanding of appellant's claims.

After several months of searching for someone to murder his estranged wife, Farah Fratta,

---

[1]  Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

[2]  Throughout these proceedings, appellant has filed *pro se* pleadings and letters in an attempt to supplement his attorneys' efforts.  Appellant is not entitled to hybrid representation.  *See Scheanette v. State,* 144 S.W.3d 503, 505 n.2 (Tex. Crim. App. 2004).  Thus, we do not address his *pro se* points.

appellant found Joseph Prystash, who obtained the assistance of a third person, Howard Guidry. On November 9, 1994, the date of the murder, appellant took the couple's three children to Wednesday-evening church classes and attended a parents' meeting at the church. Although the children regularly attended classes there, it was unusual for appellant to stay for the parents' meeting. Appellant repeatedly left the meeting to make and receive telephone calls in the church office. Farah was shot and killed in her garage as she arrived home and stepped out of her car, shortly before appellant was scheduled to return the children to her. She died approximately two years after she filed for divorce and less than three weeks before the scheduled divorce and custody trial date.

The state's theory concerning motive was that the prolonged divorce and child custody proceedings formed the underlying basis for appellant's desire to have his wife killed. Several witnesses testified that initially, appellant did not want the divorce. He complained that sex with Farah was not exciting, but he thought that they could resolve their problems without a divorce if Farah would agree to an "open marriage."

A social worker who was assigned by the family court to evaluate appellant and Farah in connection with the custody proceedings testified that she interviewed appellant in April 1993 and Farah in March 1993. At that time, appellant did not want primary custody of the children, and Farah was in favor of an extended visitation schedule for appellant. However, appellant and Farah were at odds because appellant wanted to restrict Farah's ability to change residences with the children to within a 100-mile radius, while Farah did not want a restriction on her ability to move, and appellant wanted joint managing control over decisions about the children's lives, such as medical and educational decisions, while Farah wanted sole control.

As the divorce proceedings dragged on, appellant grew increasingly bitter and angry toward

Farah. He complained to friends that he was broke all the time because he had to pay child support, and he said he wanted primary custody of the children so that Farah would have to pay him. At other times, he said that he would not have to pay child support if he killed her. He complained that Farah would "win" because her parents had money. He regularly called her "the bitch."

During a deposition in December 1993, Farah explained why the divorce petition had been filed on grounds of cruelty. Afterward, appellant told a friend that he was angry about the accusations she made against him, which he said were false, and he did not want other people to hear the things she had said. Appellant began actively seeking someone to kill Farah. He solicited many of his friends and acquaintances to kill her or to recommend someone who could kill her. Initially, most of his friends thought that he was joking or blowing off steam, but as he continued to talk about it over time, some of them came to believe that he was serious.

Prystash was not part of appellant's regular circle of friends, but on several occasions in the weeks leading up to the offense, the two men were observed speaking privately together at a health club where they were both members. Prystash's girlfriend, Mary Gipp, overheard Prystash communicating with appellant by telephone. In addition, she often saw Prystash talking to her next-door neighbor, Guidry, on the balcony outside her apartment. On the evening that Farah was murdered, Gipp came home from work to find Guidry, dressed in black, sitting on the steps in front of her apartment. Prystash arrived a few minutes later but he soon left again. When he returned to Gipp's apartment that night, Guidry was with him.

### Confrontation Clause

The details of the offense were developed primarily through Gipp's testimony describing her observations and her conversations with Prystash, the testimony of some of Farah's neighbors who

observed parts of the offense and saw a suspect leaving the scene, witnesses who spoke with and observed appellant around the time of the offense, and law-enforcement officers who investigated the crime scene. Further evidence included telephone and pager records showing the times and locations of communications between appellant, Farah, Prystash, and Guidry on the evening of the offense and autopsy and ballistics reports.

In points of error one through ten, appellant alleges that Gipp's testimony recounting Prystash's statements to her was admitted in violation of the Confrontation Clause under *Crawford v. Washington.* 541 U.S. 36 (2004). Specifically, appellant complains that the trial court erred by ruling that the statements were non-testimonial. He asserts that the statements were not the sort of spontaneous, casual statements that are properly determined to be non-testimonial. Appellant complains of the following ten statements:

(1)     The murder was to happen on Wednesday night;

(2)     Prystash was the driver;

(3)     Prystash was the middle man who was to find someone to kill Farah;

(4)     Prystash was going to the President and First Lady health club;

(5)     Prystash was going to the President and First Lady health club to meet "Bob;"

(6)     They had killed Farah;

(7)     Prystash knew Farah was dead because he saw her body in her garage;

(8)     Prystash gave Guidry the murder weapon to dispose of;

(9)     Guidry threw the murder weapon into a body of water;

(10)    Prystash was to get a Jeep for his part in the offense.

The Confrontation Clause provides that, in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. *De La Paz v. State,* 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). Consistent with this guarantee, a testimonial hearsay statement may be admitted in evidence against a defendant only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine. *Id.* Generally speaking, a hearsay statement is "testimonial" when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Id.*

Testimonial statements include those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford,* 541 U.S. at 52. Statements made to police officers during formal structured interrogations are testimonial. *Id.* at 52–53, 68. Casual remarks to acquaintances generally are not. *Id.* at 51; *see also Woods v. State,* 152 S.W.3d 105, 114 & n.34 (Tex. Crim. App. 2004). Although we defer to the trial court's determination of historical facts and credibility, we review the constitutional ruling of whether a statement is testimonial or non-testimonial *de novo. Wall v. State,* 184 S.W.3d 730, 742 & n.44 (Tex. Crim. App. 2006).

The record establishes that these statements were non-testimonial. Prystash made the first three statements to Gipp in conversations that took place before the offense. He made the fourth through seventh statements in a conversation that took place in Gipp's apartment shortly after the offense, while he was unloading and concealing the murder weapon. After that conversation, Prystash left the apartment. Gipp retrieved two spent shell casings that Prystash had thrown into the kitchen trash, and she wrote down the serial number of the murder weapon that he had hidden under

some clothes in the bedroom. She did not go to the police, and later she disposed of the shell casings in a trash can at a shopping mall.

The next two statements are arguably more problematic because Prystash made them to Gipp after the police had come by her apartment. A reasonable person in those circumstances would be mindful of an ongoing investigation and the possibility of a later prosecution. However, Gipp testified that, as a result of that visit from police, she was worried about the presence of the murder weapon in her apartment, and so she asked Prystash what he had done with it. Gipp was focused on her own potential liability in the event that the police should find the weapon in her apartment, rather than on collecting information for use in a later prosecution. Therefore, we hold that statements 8 and 9 were non-testimonial. *See Davis v. Washington,* 547 U.S. 813, 822-23 (2006); *see also Langham v. State,* 305 S.W.3d 568, 576 (Tex. Crim. App. 2010).

The record does not reflect that statement 10 was made in response to any question, and its prospective language described Prystash's expectations rather than a past event. *See, e.g., Bullcoming v. New Mexico,* 131 S.Ct. 2705, 2714 n.6 (June 23, 2011) (quoting *Davis,* 547 U.S. at 822) ("To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution'"). Therefore the trial court did not err in finding that it was non-testimonial. Points of error one through ten are overruled.

**Rule of Evidence 803(24)**

In points of error eleven through twenty, appellant alleges that the above ten statements were admitted in violation of Rule 803(24) of the Texas Rules of Evidence. Specifically, appellant asserts that statements 4, 5, and 9 were non-self-inculpatory, and that statements 2 and 3 were "blame-shifting." Appellant does not specifically challenge the self-inculpatory character of statements 1,

6, 7, 8, and 10, but he asserts that the Fifth Circuit has already determined that all ten statements did not possess particularized guarantees of trustworthiness. *See Fratta v. Quarterman,* 536 F.3d 485 (5th Cir. 2008). However, the Fifth Circuit did not determine the admissibility of any of Prystash's statements to Gipp as a matter of state evidentiary law. *See id.* at 502, 505–07. Rather, the Fifth Circuit assessed whether Prystash's statements to Gipp violated the Confrontation Clause under *Ohio v. Roberts,* 448 U.S. 56 (1980), which was the leading case when appellant's first conviction became final. *Fratta,* 536 F.3d at 490. In 2004, the Supreme Court held that, when non-testimonial hearsay is at issue, the states are afforded flexibility in their development of hearsay law. *See Crawford,* 541 U.S. at 68.

Generally speaking, the hearsay rule excludes any out-of-court statement offered to prove the truth of the matter asserted. *Walter v. State,* 267 S.W.3d 883, 889 (Tex. Crim. App. 2008). Rule 803(24), however, provides an exception for statements against interest. *Id.* at 890. The rationale behind this exception is that people ordinarily do not make damaging statements about themselves unless they believe that the statements are true. *Id.*

The rule sets out a two-step protocol for the determination of admissibility. *Id.* First, the trial court must determine whether the statement, considering all the circumstances, subjects the declarant to criminal liability and whether the declarant realized this when he made the statement. *Id.* at 890–91. Second, the court must determine whether there are sufficient corroborating circumstances that clearly support the trustworthiness of the statement. *Dewberry v. State,* 4 S.W.3d 735, 751 (Tex. Crim. App. 1999). A trial court should consider a number of factors: (1) whether the guilt of the declarant is inconsistent with the guilt of the defendant; (2) whether the declarant was so situated that he might have committed the crime; (3) the timing of the declaration; (4) the

spontaneity of the declaration; (5) the relationship between the declarant and the party to whom the statement is made; and (6) the existence of independent corroborative facts. *Id.*

Statements that are directly against the declarant's interest and collateral "blame-sharing" statements may be admissible under Rule 803(24) if corroborating circumstances clearly indicate their trustworthiness. *Walter,* 267 S.W.3d at 896. However, "blame-shifting" statements that minimize the speaker's culpability are not admissible, absent extraordinary circumstances. *Id.* Thus, the trial judge is obligated to parse a generally self-inculpatory narrative and weed out those specific factual statements that are self-exculpatory or that shift blame to another. *Id.* at 897. The trial court's ruling on the admissibility of a hearsay statement pursuant to an exception is reviewed under an abuse of discretion standard. *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

### A. Statements 4, 5, and 9

Whether a statement is self-inculpatory can be determined only by viewing it in context. *See Williamson v. United States,* 512 U.S. 594, 603 (1994). Viewed in context, Prystash's statements 4 and 5, that he was going to the health club to meet "Bob," are self-inculpatory and blame-sharing. Before the murder, Prystash told Gipp of his participation in the murder-for-hire scheme to kill Farah. On the night of the murder, after telling Gipp that they had killed Farah and after hiding a gun in Gipp's apartment, Prystash left. His statement as he was leaving, that he was going to the health club to meet Bob, conveyed his continuing participation in the scheme that he had already described to Gipp.

Further, statements 4 and 5 were independently corroborated by testimony that after he left Gipp's apartment, Prystash was seen at the President and First Lady health club where he and appellant were members. He arrived within half an hour of closing time, dressed in street clothes

and without a gym bag. Prystash was reluctant to let the club manager scan his membership card. He said that he was looking for someone, and the manager informed him that the person he was looking for was not there.

Statement 9, that Guidry threw the murder weapon into a body of water, is not hearsay because it was not offered for the truth of the matter asserted. Jurors were made aware that statement 9 was not true because other witnesses testified that the murder weapon was found in Guidry's possession when he was arrested in March 1995 for an unrelated offense. Moreover, statement 9 did not inculpate appellant. *See* TEX. R. APP. P. 44.2(b); *see also Walter,* 267 S.W.3d at 900.

### B. Statements 2 and 3

In the context of the murder-for-hire scheme, the trial court did not abuse its discretion by admitting statements 2 and 3, that Prystash was the driver and middleman, pursuant to Rule 803(24). It was within the zone of reasonable disagreement to characterize these statements as blame-sharing rather than blame-shifting because they inculpated Prystash as a conspirator without shifting major blame to another person. In fact, the prospective language of statement 3 inculpated Prystash as a conspirator even before he had found anyone to help him carry out the offense.

Further, statements 2 and 3 were independently corroborated by the following evidence: (1) appellant and Guidry did not know each other but Prystash knew both men; (2) unusually frequent communications between appellant and Prystash in the weeks leading up to the murder; (3) telephone and pager records showing the times and locations of telephone calls between appellant and Prystash, and Prystash and Guidry, on the evening of the murder; (4) a car with a broken headlight, similar to Prystash's, was observed picking up the shooter from the scene of the offense; (5) Prystash replaced a burned-out headlight on his car the day after the murder, and within a couple of weeks, he stopped

driving that car; and (6) a gun purchased by appellant was seen in Prystash's possession when he removed two spent shells from it shortly after the murder and hid it under some clothes in Gipp's apartment, and the same gun was later found in Guidry's possession.

## C. Statements 1, 6, 7, 8, and 10

In statements 1, 6, 7, 8, and 10, Prystash admitted to Gipp that the murder was to happen on Wednesday, that they had killed Farah and that he knew she was dead because he saw her body in her garage, that he gave the murder weapon to Guidry to dispose of, and that he would get a Jeep for his part in the offense. These were blame-sharing statements that inculpated Prystash in the murder-for-hire scheme. They were independently corroborated by evidence that: (1) the murder happened on Wednesday night; (2) Farah's body was found in her garage; (3) a gun purchased by appellant was seen in Prystash's possession when he removed two spent shells from it and hid it shortly after the murder, and the same gun was later found in Guidry's possession; (4) appellant owned a Jeep, which he had offered to persons other than Prystash and Guidry as payment for murdering Farah; and (5) shortly after the offense, Prystash was looking for someone at the health club where he and appellant were members. Points of error eleven through twenty are overruled.

## Sexual Deviance

In points of error twenty-one and twenty-two, appellant asserts that the admission at the guilt phase of evidence of his sexually deviant preferences and behaviors was error because such evidence was not relevant to his guilt and was more prejudicial than probative. *See* TEX. R. EVID. 401, 403. Specifically, appellant complains that the trial court allowed the state to present evidence that appellant wanted to watch his wife engage in lesbian sexual activities, have her defecate in his mouth, urinate on him, and choke him while he masturbated. He asserts that such "graphic

specifics" were unnecessary at the guilt phase, and therefore they were not relevant. He argues that it was not necessary for the state to present evidence of sexual deviance to show his motive because there was a plethora of evidence that appellant was angry about the divorce and his wife's stance regarding custody of the children. Appellant argues that at the very least, the graphic and disgusting language about his sexual perversions should have been excluded because it was unduly prejudicial. He complains that this evidence likely impressed the jury in some irrational but indelible way.

As presented at trial, the lesbian-sexual-activities evidence was distinct from the other sexual-preferences evidence, and so we will address the two types of evidence separately. Several witnesses testified without objection that appellant wanted to have an "open marriage." Two witnesses specifically testified about appellant's personal definition of an "open marriage." The first witness testified that appellant's idea of an "open marriage" included watching his wife have sex with other women. Appellant objected to this testimony on grounds of hearsay and relevance. *See* TEX. R. APP. P. 33.1. The second witness testified that appellant's idea of an "open marriage" included having sex with his wife in combination with other women. Appellant objected to this testimony only on grounds of attorney-client privilege and settlement-negotiation privilege. Therefore appellant failed to preserve his claims of relevance and undue prejudice with regard to the latter testimony. *See id.* Because appellant did not object to the second witness's testimony on grounds of relevance and undue prejudice, the admission of the first witness's testimony, even if erroneous, would not result in reversal. *See id.*; *see also Coble v. State,* 330 S.W.3d 253, 282 & n.82 (Tex. Crim. App. 2010) (any error in the admission of evidence is cured where the same evidence comes in elsewhere without objection).

By contrast, the record shows that appellant was careful to preserve error concerning the

presentation of allegations from Farah's deposition about his other sexual preferences. Before trial, the court granted the defendant's motion in limine, which extended to references by the state to "deviate sexual preferences as inadmissible character evidence [and the] allegation that [appellant] committed deviant sexual acts as described by the complainant on December 15, 1993."

At trial, the subject of the December 1993 deposition was first raised during the testimony of James Beeler, Farah's first divorce lawyer. The jury was retired while the prosecutor proffered that Beeler would testify that Farah had said in her deposition that appellant wanted her to defecate in his face, urinate on his face, choke him while he masturbated, and hit him in the stomach while he masturbated, and that he wanted her to perform such acts on a daily basis.

Appellant objected that this testimony was hearsay, violated the Confrontation Clause, and violated Rules 404, 403, and 401.[3] The prosecutor responded that this evidence was not offered for the truth of the matter asserted but rather to show that the defendant, who was present during the deposition, heard Farah's allegations and became angry. As such, this testimony was relevant to his motive. The prosecutor represented that other witnesses would testify that appellant was angry when he told them about the accusations Farah had made in the deposition, which he said were not true, and that he did not want these accusations coming out in court.

Defense counsel responded that under *Crawford,* Farah's deposition testimony was a testimonial statement that implicated the Confrontation Clause, and motive was not an exception to the hearsay rules. Counsel further argued that the allegations of specific acts were not relevant and that they were not evidence of a motive for murder, just evidence that appellant was angry.

_____

[3] On appeal, appellant does not complain that this testimony was hearsay or that its admission violated the Confrontation Clause or Rule 404.

Therefore, there was no need to go into the details of what Farah had said. The prosecutor answered that admitting this evidence did not constitute a Confrontation Clause violation because appellant had had Farah killed and therefore, he forfeited his confrontation right. The prosecutor reiterated that this evidence was not offered to prove the truth of Farah's allegations, but instead to show that appellant had heard Farah make them.

The trial court ruled that Farah's allegations were not offered for the truth of the matter asserted, and so they were not hearsay. They were relevant and admissible as evidence of motive, and their probative value outweighed any prejudicial effect. The trial court granted appellant's request for a limiting instruction to inform the jury that the allegations were offered for the purpose of determining motive and not for their truth. This instruction was given when the evidence was admitted.[4] A similar instruction was included in the jury charge.[5]

Beeler's testimony before the jury was consistent with the prosecutor's proffer. Beeler also stated that Farah was extremely emotional and distraught when she first gave him this information. He further testified that when Farah made these allegations during the deposition, appellant became nervous and agitated. On cross-examination, Beeler acknowledged that parties to divorce

---

[4] Immediately after the evidence was admitted, the court instructed the jury:

[T]he testimony of this witness on the last two questions was offered for the purposes of aiding you, if it does aid you, in determining the motive, if any.

\* \* \*

And it's not offered for the truth of the matter asserted.

[5] After the parties rested and closed at the guilt phase, the court instructed the jury that

if there is any evidence before you in this case regarding the defendant's having committed acts other than those alleged against him in the indictment, to-wit: Extraneous sexual acts, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that allegations of extraneous sexual acts were alleged, if any, and even then you may only consider the same in determining the motive of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

proceedings sometimes make outlandish accusations against one another. He further testified that the divorce petition was initially prepared as a "no-fault" petition but that the petition was modified to allege cruel treatment after an attempt at reconciliation failed and Farah disclosed this information to him. Farah's deposition testimony would have been used before a jury if the divorce had proceeded to trial.

Rule 401 defines "relevant evidence" as any evidence having any tendency to make the existence of a fact of consequence more or less probable than it would be without the evidence. TEX. R. EVID. 401; *see also Shuffield v. State,* 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). Except as otherwise provided by statute or rule, a jury is entitled to have before it all possible relevant information about the individual defendant whose fate it must determine. *Sells v. State,* 121 S.W.3d 748, 766 (Tex. Crim. App. 2003).

Rule 403 provides that evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. *Solomon v. State,* 49 S.W.3d 356, 366 & n.26 (Tex. Crim. App. 2001). The balance between the probative value and the countervailing factors set out in Rule 403 is always slanted toward the admission of relevant evidence. *De La Paz v. State,* 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). We generally consider the following factors in this analysis: (1) how probative is the evidence; (2) the potential of the evidence to impress the jury in some irrational but indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Solomon,* 49 S.W.3d at 366 & n.26.

We review a trial judge's Rule 401 and 403 decisions for an abuse of discretion. *Moreno v.*

*State,* 858 S.W.2d 453, 463 (Tex. Crim. App. 1993). We will reverse the trial judge's decision only if it is outside the zone of reasonable disagreement. *Salazar v. State,* 38 S.W.3d 141, 150 (Tex. Crim. App. 2001). Further, if the trial court's evidentiary ruling is correct under any applicable theory of law, it will not be disturbed even if the trial court gave a wrong or insufficient reason for the ruling. *Sewell v. State,* 629 S.W.2d 42, 45 (Tex. Crim. App. 1982).

Evidence that Farah accused appellant of extreme sexual deviance, in graphic and specific terms, during a deposition that would be used in the divorce proceedings, was relevant and highly probative because it made facts of consequence–appellant's motivation and intent to arrange Farah's murder–more likely. *See De La Paz,* 279 S.W.3d at 349. Although the graphic specifics of Farah's accusations could potentially affect the jury in an irrational way, the trial court minimized this risk by instructing the jury that the accusations were to be considered only in determining appellant's motive and not for their truth. We presume that the jury followed these instructions, and appellant has not rebutted that presumption. *See Colburn v. State,* 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). When questioning Beeler and making his closing argument, appellant suggested that Farah's accusations were false or exaggerated, and the state did not challenge this suggestion. The state did not devote a significant amount of time to the presentation of this evidence. The state sought to show that appellant's desire to have Farah killed arose in part from his view of the divorce proceedings as an embarrassment, and this evidence revealed the extent of the potential embarrassment that appellant believed he faced. Farah's detailed accusations helped the jury understand how appellant's anger and embarrassment could rise to the level of a motive for murder.

Appellant now complains that Farah's deposition allegations were not relevant to his motive because he did not hide these sexual preferences, and so he would not have killed her in order to

keep her from disclosing them. He points to two witnesses who testified during the punishment phase that appellant had indicated to them that he liked to have women defecate in his face. However, notwithstanding these two instances of limited disclosure, the record demonstrates that appellant did not widely share this information. Unlike his desire for an open marriage, appellant did not disclose his other sexual preferences to Farah's attorney and the social worker connected with the divorce proceedings. Farah's attorney testified that appellant seemed embarrassed and nervous when Farah alleged during her deposition that appellant wanted her to engage in this behavior. One of appellant's friends testified that appellant told him that he was angry about these allegations, which he said were false, and he did not want Farah to repeat them in open court.

In light of the state's burden of proof and the matters placed in issue by the defense, the trial court did not abuse its discretion when it determined that this evidence was admissible under Rules 401 and 403. Points of error twenty-one and twenty-two are overruled.

### Conflict of Interest

Points of error twenty-three through twenty-six are predicated upon appellant's allegation that a conflict of interest arose between him and his second-chair counsel, Vivian King, during the punishment phase. The events giving rise to the alleged conflict are described below.

The jury returned a verdict of guilty on Friday, May 15, 2009. The trial court received the verdict and announced a recess until Tuesday, May 26, 2009. Around that time, an investigator from the district attorney's office requested that the sheriff's office monitor and record telephone calls that appellant placed from the jail.

On the evening of Thursday, May 21, the prosecutor telephoned appellant's first-chair counsel, Randy McDonald, to notify him of her intent to introduce a recorded telephone conversation

dating from May 14 and some photographs that were seized from appellant's jail cell on May 21 as a result of appellant's comments during that conversation. She told McDonald that appellant had stated in the conversation that he had received some nude photographs of someone from King. Based on that conversation, deputies searched appellant's cell and seized the photographs he had described, along with some other items identified as contraband. The prosecutor informed McDonald that she intended to introduce the telephone conversation and the photographs into evidence, but that she would redact appellant's reference to King. McDonald's investigator obtained a CD copy of the recorded conversation from the district attorney's office on Friday afternoon but was unable to play it. McDonald obtained a working copy of the recording and copies of the photographs on the following Monday, May 25, which was Memorial Day.

King first learned of the telephone conversation and photographs when she went to McDonald's office around noon on Monday. At that time, she listened to the telephone conversation and reviewed the photographs. King then scanned through her e-mails in an effort to identify "Betsy," the person to whom appellant had been speaking. King discovered that, in the past, she had received e-mails from someone named Betsy Gomez that were potentially useful as evidence. King's legal assistant would print them out at her office and place them in an envelope marked "attorney-client privileged communication work product," which she would carry to the courtroom and place on defense counsel's table. King and appellant would usually go over these materials together during trial, but if they did not have time to review them in the courtroom, then appellant might take an envelope of materials with him to review later. Based on this practice, King surmised that an envelope containing these photographs had been left on counsel's table and that appellant had carried it back to the jail.

On Tuesday, May 26, the state presented its case-in-chief at punishment and rested. The record for that day contains no mention of the telephone conversation and photographs. When the court recessed for the day, the defense anticipated presenting its case-in-chief the following morning. However, on the morning of Wednesday, May 27, outside the presence of the jury, King requested and received an opportunity to make a record concerning the telephone conversation and photographs. She explained her practice of consulting with appellant about newly received materials that were potentially useful as evidence. In support of King's explanation, the trial judge acknowledged her prior discussions with King concerning the logistical difficulty of finding opportunities for appellant's attorneys to consult with him during the trial about materials that might be helpful in preparing his defense, and her awareness that King had been working around that difficulty by having appellant review such materials while they were in court and while appellant was in the holdover cell.

The prosecutor indicated that the record should reflect that appellant took the envelope and its contents back to the jail of his own accord and not on the instruction of his attorneys. She reasoned that providing obscene material to an inmate could be a class C misdemeanor and so the record needed to establish that appellant's attorneys did not provide it to him in jail: "so that no one has to answer for any criminal liability down the line, . . . I think we also need to establish that he did that all on his own." Appellant made a statement affirming that he alone was responsible for the decision to carry the envelope containing the photographs back to the jail. He added that he did not believe that the photographs were obscene or that he was committing an offense by possessing them. King also challenged the state's characterization of the photographs as obscene and indicated that she was still not sure whether the photographs had any potential value as evidence for the defense.

King then proposed to have her legal assistant, who was present, make a statement about printing out the photographs at the office and carrying them to the courtroom in envelopes. The prosecutor interjected, cautioning that King's legal assistant could be exposed to criminal liability and so she should not make a statement to the court without legal representation. At that point, King expressed that the threat of criminal liability was extremely intimidating and stressful, placed an undue burden on her, and affected appellant's right to a fair trial. She complained that, after learning of the telephone conversation on Monday, she had been unable to work on appellant's defense because she was too distracted by trying to figure out what had happened with the photographs and how best to defend herself. She requested a mistrial.

The prosecutor explained that she had no intention of discussing how the photographs came to be in appellant's possession or in pursuing an investigation against defense counsel, but that the sheriff's office was also involved and so King's legal assistant should not make a statement in court, where the bailiff was an agent of the sheriff, without knowing what she might be getting herself into. The trial court denied the motion for a mistrial and ruled that there would be no mention before the jury of how appellant came into possession of the photographs. The trial court also made findings that none of the attorneys had acted in bad faith or committed professional misconduct.

Following that proceeding, the trial continued before the jury. The defense presented its punishment-phase case-in-chief and rested. The state then presented its rebuttal. When the jury was excused, the court and the parties anticipated that proceedings before the jury would resume at noon the following day, May 28, with the state completing its rebuttal, and the parties beginning closing arguments around 3:00 p.m.

However, late in the morning of Thursday, May 28, 2009, the defense again requested a

mistrial, and the court conducted a hearing outside the presence of the jury. Defense counsel presented a newspaper article that had run that morning with the headline, "Fratta Lawyer May Face Inquiry." First-chair counsel McDonald stated that, given the article's representation that a spokesman from the district attorney's office had indicated that King might be investigated for providing contraband to appellant, this article created a conflict of interest between appellant and counsel by placing King in the position of trying to defend her own actions and appellant's at the same time. McDonald requested that the court poll the jurors about whether they had seen the article. In addition, he requested a continuance. Initially, the trial court denied these requests. The court reiterated that no reference to King as the source of the photographs would be allowed at trial.

King then expressed that she was not ready to present a closing argument because she had been distracted by having to defend herself on Monday and Wednesday; her office was in chaos because her legal assistant was ready to quit after being threatened with criminal charges at the Wednesday proceeding and seeing the newspaper article; King was upset because she had been chastised by one of the prosecutors for her handling of the matter on Wednesday; the prospect of the sheriff's office's involvement placed her in conflict with every bailiff in the courthouse; and although she had intended to write her closing argument Thursday morning, she had spent all morning fielding questions from attorneys and reporters about the newspaper article. King stated that she could no longer effectively represent appellant and that she did not know what the appropriate remedy should be. She requested a mistrial and a continuance. She indicated that if she did not receive a continuance, the case would have to go forward without her:

> I have not been able to concentrate on anything but myself and my integrity, where my focus should be on [appellant]. And it should not be on what's going to happen to me now. . . .

So, I'm letting the Court know that I can no longer effectively represent [appellant] at this time. I don't know what the right remedy is. I don't know if I should be asking for a continuance. . . . my only interest here is to . . . diligently represent my client. And I think that's been impeded.

* * *

I don't know what the remedy is, but I'm asking for a mistrial at this time. And maybe a continuance. I think I have a right to a least prepare an argument for him. At this point, I can't argue. And if we go forward, that's fine, but I will not be able to participate in argument.

At that time, although the trial court did not expressly grant any motions or requests on the record, the court commenced an in-chambers poll of the jurors about whether they had seen the newspaper article. McDonald represented appellant during the juror poll. Afterward, the court announced that closing arguments would not begin that day. Instead, the presentation of evidence would be completed and then the lawyers would be given "an opportunity to take a step back from this issue, regroup, refocus, and move forth." The state then completed its rebuttal. The jury was excused for the day, and the parties, with McDonald speaking for the defense, discussed the jury charge.[6]

On the morning of Friday, May 29, 2009, the parties informed the court that they were ready for the jury. The court read the jury charge. After the state presented its initial closing argument, King presented the first part of the defense's argument. Following arguments, the jury began deliberating.

On Saturday, May 30, 2009, while the jury was still deliberating, King entered exhibits in support of a bill of exception. She submitted the marked envelope that contained the seized

---

[6] The record affirmatively demonstrates that McDonald rather than King represented appellant during the juror poll. Although King's name does not appear in the record for the rest of the day, the record does not affirmatively demonstrate that King was absent from the courtroom during that time. Either she was absent, or she was present but not speaking, during the state's rebuttal and the discussion of the jury charge.

photographs, and a print-out of an e-mail that was representative of e-mails that her legal assistant had been carrying to the courtroom for her to review with appellant during the trial. Later that day, the jury reached a verdict. The court reconvened on Monday, June 1, 2009, for sentencing. After sentencing, King and McDonald addressed the court about obtaining an order to facilitate the return of appellant's property to him in prison.

In point of error twenty-three, appellant asserts that the trial court violated his right to the effective assistance of counsel at the punishment phase by failing to obtain a waiver of conflict-free representation after a conflict of interest arose between appellant and King.[7] In point of error twenty-four, appellant asserts that an unwaivable *per se* conflict of interest arose between appellant and King that does not require a showing of prejudice.

The principle that a criminal defendant is entitled to the assistance of counsel free from any conflict of interest that conceivably could impair counsel's effectiveness is clearly and firmly established in our law. *Ex parte Prejean,* 625 S.W.2d 731, 733 (Tex. Crim. App. 1981). On the facts of this case, however, we find that appellant's right to the effective assistance of counsel was not violated. Appellant does not allege a conflict of interest or ineffective assistance of counsel with respect to his first-chair counsel, McDonald. *See Ex parte McFarland,* 163 S.W.3d 743, 760 (Tex. Crim. App. 2005) (although his retained attorney slept through portions of the trial, applicant was not deprived of the assistance of counsel under the Sixth Amendment because his court-appointed second attorney was present and an active advocate at all times). There was no indication that

---

[7] Appellant repeatedly describes this alleged conflict of interest as "State-created." Assuming without deciding that the source of the alleged conflict might be relevant to our analysis, we observe that the threat of an investigation and criminal liability as to King was a result of appellant's comments to "Betsy" in recorded collect telephone calls he placed to her from jail, which asserted that King had given him Betsy's photographs, including an "exposed one," and that he had masturbated while looking at them.

McDonald was unable or unwilling to prepare and present a defense if King could not go forward. Points of error twenty-three and twenty-four are overruled.

In point of error twenty-five, appellant asserts that he was denied his constitutional right to the effective assistance of counsel because an actual conflict of interest caused a lapse in representation, namely, the preparation and presentation of closing argument at the punishment phase. As discussed above, appellant has failed to show a violation of his right to the effective assistance of counsel because he does not allege a conflict of interest with respect to McDonald. There was no indication that McDonald was unwilling or unable to prepare and present the defense's closing argument if King could not go forward. Moreover, after King stated that she had not had an opportunity to prepare her closing argument, the court gave her additional time. The following morning, the defense announced ready, and King presented her closing argument. Point of error twenty-five is overruled.

In point of error twenty-six, appellant asserts that the trial court erred by failing to grant a mistrial. A trial court's denial of a request for a mistrial is reviewed under the standard of abuse of discretion. *Ladd v. State,* 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). A mistrial is used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Id.* A mistrial is an extreme remedy that should be granted "only when residual prejudice remains" after less drastic alternatives have been explored. *Ocon v. State,* 284 S.W.3d 880, 884–85 (Tex. Crim. App. 2009). When the party requesting a mistrial does not first request a lesser remedy, we will not reverse the court's judgment if the problem could have been cured by a less drastic alternative. *Id.* at 885; *see also Wood v. State,* 18 S.W.3d 642, 648 (Tex. Crim. App. 2000).

In this case, defense counsel first moved for a mistrial the day after the state rested its case-

in-chief at the punishment phase. Defense counsel next moved for a mistrial and a continuance the day after the defense rested its case-in-chief. Assuming *arguendo* that a conflict of interest had arisen between appellant and King, a mistrial was not appropriate because appellant did not allege, and the facts before the trial court did not reveal, a conflict of interest between appellant and McDonald. Moreover, King's specific concern was that she had not had an opportunity to prepare and present a closing argument. The trial court gave her additional time, after which the defense announced ready, and King presented her closing argument. Point of error twenty-six is overruled.

**Voir Dire**

In point of error twenty-seven, appellant claims that the trial court erroneously granted the state's challenge for cause to prospective juror Ronald Wachtman, in violation of *Wainwright v. Witt,* 469 U.S. 412 (1985). Under *Witt,* the trial court may grant a challenge for cause to a prospective juror based upon his views of the death penalty only if those views will prevent or substantially impair the juror from following his oath and the applicable law. *Segundo v. State,* 270 S.W.3d 79, 93 (Tex. Crim. App. 2008). A juror need not shed his personal convictions regarding the death penalty at the door to the jury room, but he must use the law, the evidence, and the trial court's mandates as his ultimate guides in arriving at decisions as to guilt or innocence and as to punishment. *Granados v. State,* 85 S.W.3d 217, 235 (Tex. Crim. App. 2002).

A prospective juror who refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge may be properly challenged even if he might vote for death under certain personal standards. *Bell v. State,* 724 S.W.2d 780, 794 (Tex. Crim. App. 1986). Factors other than those prescribed by law must not be made absolute prerequisites for the imposition of any punishment, including the death penalty. *Fuller v. State,* 829 S.W.2d 191, 200 (Tex. Crim. App.

1992). Any prospective juror who is unable to consider the maximum penalty allowed by law for all legally eligible candidates is biased or prejudiced against the law and, therefore, subject to a challenge for cause. *Id.*

In assessing a prospective juror's capacity to obey his oath and follow the trial court's instructions, we examine his testimony as a whole. *Fearance v. State,* 771 S.W.2d 486, 500 (Tex. Crim. App. 1988). We review the trial court's ruling on the matter with considerable deference because the trial court is in the best position to evaluate the venire member's demeanor and responses. *Davis v. State,* 313 S.W.3d 317, 343–44 (Tex. Crim. App. 2010). When a prospective juror's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial court. *Ladd,* 3 S.W.3d at 559. We will reverse the trial court's ruling only if the record shows a clear abuse of discretion. *Gardner v. State,* 306 S.W.3d 274, 296 (Tex. Crim. App. 2009).

The record in this case reflects that the prosecutor began voir dire by asking Wachtman about his affirmative response to a written question on the jury questionnaire: "Do you have any moral, religious, or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being?" Wachtman replied that he had been thinking a lot about the death penalty, even before he was summoned to jury duty, because of recent cases coming to light through the Innocence Project in which someone who had been found guilty was later proven innocent. He was worried that an innocent man had probably been executed in Texas. Wachtman also observed that many of the people on death row were very poor or indigent, which suggested that the quality of an accused's defense at trial was in direct proportion to his wealth. Wachtman indicated that the state's case would have to be very strong before he could find someone guilty and sentence him to death, but he denied that he would hold the state to a burden of proof higher than

proof beyond a reasonable doubt. He acknowledged that no one can ever be 100 percent sure of anything.

Wachtman went on to say that he might have answered the written question in error because after reading it again, he disagreed with his affirmative response. He stated that certain people and certain crimes deserve the death penalty. On further questioning, Wachtman stated that he believed anybody who intentionally took a life forfeited his right to live. He added that he "hoped" he could believe that, explaining that he had believed it when he was younger but that he had mellowed as he grew older. The prosecutor observed that Wachtman seemed to be struggling with the question of whether he could serve on the jury and follow the law, and Wachtman replied, "Clearly, this is not something I want to do."

The prosecutor later asked Wachtman how his feelings about the death penalty would affect his ability to answer the special issues:

> [W]hat I'm concerned with is – you're fine in the realm of a life sentence, but I'm concerned that you would never give serious consideration to answering those special issues in a way where a death sentence was imposed. What do you think about that?

Wachtman replied, "I think I would answer those questions." He added that he thought he could seriously contemplate answering the questions in a way that would result in the defendant being executed. When the prosecutor asked him for examples of cases where he would consider the death penalty to be appropriate, Wachtman stated, "I think if someone knowingly, with a full intent took another person's life, they don't deserve to live." The prosecutor explained that Wachtman had just defined murder rather than capital murder, and that capital murder required some aggravating circumstance. Wachtman replied that based on that definition, he thought that some people who committed "plain" murder deserved the death penalty.

The prosecutor then directed Wachtman to a series of written responses he had given on the questionnaire in which he expressed strong misgivings about the death penalty. She asked Wachtman how he could reconcile his written statement on the questionnaire, that he was opposed to capital punishment, with his statement on voir dire, that if someone took a life then he forfeited his own life. Wachtman responded that some very young people who committed murder were not old enough to know the consequences of what they did and so should not be put to death.

Concerning his written questionnaire response that capital punishment was wrong but necessary, Wachtman explained that putting someone to death is killing, and killing is wrong, but "there is something in me that says when people do certain things they deserve to die." When the prosecutor asked Wachtman about his questionnaire response in which he disagreed with the statement, "Capital punishment is just and necessary," Wachtman stated that his written answer was focused on whether capital punishment is just. He again expressed concern about cases in which convictions had been overturned. He stated that in a perfect world, where only guilty people were found guilty, capital punishment would be okay.

Next, the prosecutor briefly reviewed the future-dangerousness and "anti-parties" special issues. She then asked Wachtman more specifically about the mitigation special issue. When asked if he would always answer the mitigation special issue affirmatively because he would be worried about making a mistake, Wachtman first replied that he did not know, then said that he "very well could," and then, "That's very possible." The prosecutor asked Wachtman if he would be so concerned about the possibility of sending an innocent man to his death that he would always answer the mitigation issue in a way that would result in a life sentence. Wachtman replied that he did not think that he would do that, but he was not certain. He acknowledged that he was not sure if he

would be able to reconcile his personal belief and the law. At that point, the trial court warned the prosecutor that her time was up. The prosecutor pressed Wachtman for a more definite answer:

> Regardless of the facts, the circumstances, or the evidence, are you always going to answer [the mitigation special issue] in a way that results in an individual getting a life sentenced [sic] because of your beliefs and your convictions and because of the reservations that you've already expressed?

Wachtman responded, "Probably so." When the prosecutor stated that he needed to say "yes" or "no," Wachtman said that he would "have to lean yes." The prosecutor then asked:

> If you are going to answer this question in a way that the answer, regardless of the facts and evidence, is always going to be "yes," then that means you can't take this oath because you will be promising to do something that you've already told us you can't. Because of what we've talked about and your reservations and your personal beliefs and because of what you just told me about the way you would answer [the mitigation special issue], is it going to put you in a position where you're not going to be capable of taking the oath to follow [the] law?

Wachtman replied, "Yes."

The trial court then sought clarification, asking Wachtman again if he could follow the law in answering the special issues:

> [W]hen we first talked, I asked you if your personal, religious, or moral beliefs would prevent you from serving on a jury where the death penalty is a possible punishment. As I understand the last answer you gave [the prosecutor], your answer to that question now is yes, it would. Is that correct?

Wachtman confirmed that, after talking it through with the prosecutor, he believed that he would answer the mitigation special issue in such a way that life rather than death would result because of his reservations about the possibility of executing an innocent person. He added that if he found the defendant guilty and then answered the first and second special issues affirmatively, he was not sure whether he could render a verdict according to the law and the evidence on the mitigation special issue.

When defense counsel questioned him, Wachtman shifted his position, explaining that he understood the standard of proof beyond a reasonable doubt and that he would apply it in determining the defendant's guilt, but that he would require more certainty than that before he could answer the mitigation special issue in a way that would result in a death sentence: "[U]nless I was 100 percent certain that person was guilty, I would probably give them the out there by [the mitigation special issue]." He added, "[W]hen it comes down to the moment where you have to decide life or death for someone, I may very likely just look and look and look for a mitigating circumstance or something to get me off the hook and not have to sentence that person to death." He then stated more definitely, "[U]nless I was 100 percent certain that person did it, then I would answer 'yes' [to the mitigation issue]."

At the conclusion of voir dire, the prosecutor challenged Wachtman for cause, arguing, among other things, that Wachtman had a bias against the law that he could not set aside. Defense counsel objected to the challenge, arguing that Wachtman would apply the reasonable-doubt standard at the guilt phase and that he was not challengeable for cause just because he would want more than a reasonable doubt before he would answer the mitigation question negatively. The trial court granted the challenge.

On these facts, we conclude that the trial court did not abuse its discretion by granting the challenge for cause. In response to the prosecutor's questions, Wachtman equivocated at first, but eventually he stated that his personal beliefs placed him in a position where he was not capable of taking the oath to follow the law. He affirmed that he would always answer the mitigation special issue in such a way that a life sentence would result, regardless of the facts and evidence. As such, he was challengeable for cause because his view of the death penalty would prevent or substantially

impair the performance of his duties as a juror. *See, e.g., Segundo,* 270 S.W.3d at 93; *cf. Riley v. State,* 889 S.W.2d 290, 295 (Tex. Crim. App. 1994) (prospective juror who admitted that her feelings against the death penalty would "affect" or "influence" her deliberation on the punishment issues, but who also repeatedly stated that she would follow the law and answer the punishment issues based on the evidence and the law, was not challengeable for cause).

When defense counsel attempted to rehabilitate him, Wachtman stated several times that he could not answer the mitigation special issue in such a way that the death penalty would be imposed unless he was 100-percent certain of the defendant's guilt. One-hundred-percent certainty of guilt is a factor not prescribed by law. *See Gallo v. State,* 239 S.W.3d 757, 779 (Tex. Crim. App. 2007) ("There is no constitutional right to have jurors' residual doubts about the defendant's guilt be considered as a mitigating factor"); *see also Abdul-Kabir v. Quarterman,* 550 U.S. 233, 250–51 (2007). Wachtman made this factor an absolute prerequisite for the imposition of the death penalty. *See Fuller,* 829 S.W.2d at 200. The trial court did not abuse its discretion by determining that Wachtman was challengeable for cause. Point of error twenty-seven is overruled.

## Sufficiency of the Evidence–Future Dangerousness

In points of error thirty and thirty-one, appellant challenges the legal and factual sufficiency of the evidence to support the jury's finding of future dangerousness. He points out that his only criminal conviction is the instant offense. He asserts that, in the fourteen years between the first and second trials, his mental health was assessed by the Texas Department of Criminal Justice ("TDCJ") every ninety days and he was never found to be at risk for hurting himself or others. Until the enactment of TDCJ policies mandating that all male death-row inmates are ineligible to work, appellant was a sewing-machine operator who worked in

proximity to sharp and dangerous objects in the garment factory. During that time, he never threatened or harmed anyone or any property. His one disciplinary infraction was overturned on appeal and was ordered removed from his disciplinary record.

Appellant argues that the jury in the second punishment hearing relied on the same psychological evaluations and facts of the case that were presented to the first jury, and the first jury's future-dangerousness determination has been proven wrong by appellant's good behavior in prison. He argues that the state offered no additional evidence in this trial from which a rational jury could have found that there was a reasonable probability that appellant would be any more of a danger to prison society for the next twenty-six years than he has been for the last fourteen years. Appellant asserts that, given all the evidence, a rational jury would necessarily entertain a reasonable doubt as to the probability that he would be a future danger. He argues that the judgment should be reformed to reflect a life sentence.

### A. Factual Sufficiency

Appellant urges this Court to reconsider its refusal to conduct a factual-sufficiency review of the future-dangerousness special issue because he has no criminal history except for the instant offense and he "has been a model prisoner for fourteen years." This information is relevant to our legal-sufficiency analysis, but it does not persuade us to reconsider our prior decisions concerning factual-sufficiency review. *See Williams v. State,* 270 S.W.3d 112, 138 (Tex. Crim. App. 2008); *see also Martinez v. State,* 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Point of error thirty-one is overruled.

### B. Legal Sufficiency

When reviewing the future-dangerousness special issue, we view the evidence in the light

most favorable to the verdict and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *Wardrip v. State,* 56 S.W.3d 588, 593 (Tex. Crim. App. 2001). In determining the special issues, the jury is entitled to consider all of the evidence presented at both the guilt and punishment stages of trial. TEX. CODE CRIM. PRO. art. 37.071, § 2(d)(1); *see also Young v. State,* 283 S.W.3d 854, 863 (Tex. Crim. App. 2009). Some factors to be considered by a jury when answering the future-dangerousness issue under Article 37.071, § 2(b) include: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; (7) psychiatric evidence; and (8) character evidence. *Black v. State,* 816 S.W.2d 350, 355 (Tex. Crim. App. 1991). The circumstances of an offense alone, if severe enough, can be sufficient to sustain an affirmative finding as to a defendant's future dangerousness. *Moreno v. State,* 721 S.W.2d 295, 302 (Tex. Crim. App. 1986). Using these factors, we hold the evidence is sufficient to support the jury's affirmative answer to the future-dangerousness issue.

Before the offense, appellant spent months soliciting numerous friends and acquaintances to help him kill Farah. When friends warned him that he could get into trouble for speaking so openly about killing his wife, he told them that it was part of his strategy to confuse the criminal investigation that would follow. While soliciting one friend, appellant offered him a payment of

$1,000 cash "up front" and his Jeep, explaining that he would be able to make additional payments after he gained control of the proceeds of Farah's life-insurance policy and an overseas trust account containing the children's money. He later increased the offer to $5,000.

Appellant conferred with Prystash over the course of several weeks leading up to the offense. He planned the murder for a time when he knew that Farah would be waiting at home for him to return their children according to the visitation schedule. He made sure that he would be seen at church while the offense was being committed. During the offense, appellant communicated with Prystash by telephone and by pager. Appellant timed his own movements so that he and the children would come upon the crime scene shortly after the murder.

In the days following Farah's murder, appellant showed no signs of sadness or regret to police investigators or to his friends. One friend testified that appellant attempted, unconvincingly, to act "down" for a day or two, but then his demeanor returned to normal. Another friend testified that the day after the murder, appellant stopped by his place of employment to tell him that everything would be okay if everyone would just keep their mouths shut. A few days later, appellant stopped by again to tell his friend to make a false confession about shooting Farah if investigators questioned him.

Former friends, as well as appellant's son, described appellant as a "good talker" who could present a pleasant facade and persuade people to do things for him. Both the state's and defense's psychological experts testified that appellant suffered from personality disorders. They opined that appellant was narcissistic, paranoid, controlling, and lacked empathy. He had difficulty accepting responsibility for his actions and blamed others for his problems. He liked to think that he was dominating people, and he was the sort of person who enjoyed humiliating

those who depended on him.  Appellant was also manipulative.  He was able to maintain a calm facade and appear to function normally, but he did not think normally.  He was not able to confront or make sense of difficult situations or to learn from his mistakes.  He was "rigid" and needed to feel that he was in control of his situation and his relationships with other people.  He was likely to react with vindictive anger when frustrated or embarrassed.  Appellant was masochistic sexually and had other atypical ideas about sexuality.  The state's expert, Dr. Lawrence Abrams, testified that appellant "saw girls as little, young, passive.  Saw their sex needs controlled, restricted.  He thought he might have a need to dominate a little girl kind of thing."

While the experts' opinions were based largely on the results of psychological tests that were conducted before the 1996 trial, 13 or more years before the trial at issue here, Dr. Abrams testified that the character traits identified by a testing done by himself and four other psychologists are ongoing and do not change much over time, and the defense psychiatric expert agreed that character traits persist throughout adulthood.  On the pre-1996 tests, appellant

> showed a considerable degree of paranoia and psychopathy, meaning psychopathic deviant behavior.  They would correlate with suspiciousness, maybe fixed beliefs, holding grudges, being rebellious, not conforming to convention, maybe charming and pleasant, able to fool people, maybe even faking remorse, but, essentially, someone who would lie and have no [conscience] about it.

Dr. Abrams also testified about the inferences that may be drawn from a "scale four."

> The four is what they call a psychopathic deviancy scale. . . . If it gets high enough, you['re] into lying, you get into antisocial behavior.  And as a matter of fact, a high score there would be diagnosed as an antisocial personality disorder at this point in time, which would have to do with lying, cheating, maybe criminal behavior, a variety of things, people [who] just don't get along in society.

Dr. Abrams testified that appellant's elevated score on the four scale would indicate antisocial

behavior of the sort demonstrated by persons with antisocial personality disorder.[8] Appellant was also diagnosed as narcissistic—having a self-love so extreme that, if his desires were not fulfilled, it led to intense anger.[9] Dr. Abrams noted that appellant had been tested by the Houston Police Department and, subsequent to that testing, had twice been denied a place in a police-academy class.

Based on all of the evidence presented at the guilt and punishment phases, a rational trier of fact could have found beyond a reasonable doubt that there was a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *See Black,* 816 S.W.2d at 355; *Anderson v. State,* 717 S.W.2d 622, 634 (Tex. Crim. App. 1986). Appellant's thirtieth point of error is overruled.

### Admissibility of Punishment-phase Evidence

In points of error twenty-eight and twenty-nine, appellant argues that the admission of

---

[8] Antisocial personality disorder is defined by the DSM IV.
A) There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three or more of the following:
    1. failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest;
    2. deception, as indicated by repeatedly lying, use of aliases, or conning others for personal profit or pleasure;
    3. impulsiveness or failure to plan ahead;
    4. irritability and aggressiveness, as indicated by repeated physical fights or assaults;
    5. reckless disregard for safety of self or others;
    6. consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations;
    7. lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another;
B) The individual is at least age 18 years [at time of diagnosis].
C) There is evidence of conduct disorder with onset before age 15 years.
D) The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or a manic episode.

[9] Appellant's psychiatric expert also diagnosed narcissism.

evidence of his sexual perversions or fantasies at the punishment phase was erroneous because such evidence was not relevant to the special issues and was more prejudicial than probative. TEX. R. EVID. 401, 403. Specifically, he complains of the testimony of two acquaintances, Helen Black-Pace and Jerry Parker. He also complains of the recordings of his telephone conversations with Gomez.

## A. Acquaintances' Testimony

Black-Pace testified that she met appellant on a telephone chat line in 1989 or 1990. They chatted regularly, and after a few months their conversations became sexual. During these conversations, appellant talked about things like tying up his wife or being tied up while the three of them had sex together. Black-Pace acknowledged that she participated in these conversations and "went along with" such fantasy talk. Eventually, Black-Pace and appellant met in person. On one occasion, appellant called her and said that he wanted to stop by her apartment one morning, wake her up, and have her defecate and urinate on him and in his mouth. She told him that she would not do that, and she let him know that she was disgusted by the suggestion. Appellant did not make that suggestion to her on any other occasion.

Jerry Parker, appellant's former co-worker, testified that, while appellant's divorce was pending, appellant would bring all types of women to the fire station where they worked. Appellant seemed to be domineering and controlling toward those women. For example, appellant kept lifting up the back of one woman's dress, continually attempting to show off her bottom to his co-workers, and the woman would simply say, "No, no," and pull her dress down. Appellant told another woman to expose her breasts, and she did. He sometimes talked to Parker about his experiences in going to gay bars and about his sexual encounters involving multiple

partners. On one occasion, appellant told Parker that he liked to have women defecate on his face. Parker could not tell if appellant was joking; he thought that it was funny at first, "but then it was just gross." Defense counsel objected only to Parker's testimony about defecation. Thus, appellant has not preserved any complaint with regard to the remainder of Parker's testimony. TEX. R. APP. P. 33.1(a).

Black-Pace's testimony that appellant was interested in tying up his wife or in being tied up while the three of them had sex, and Parker's unobjected-to testimony about appellant's encounters with multiple partners, were similar to guilt-phase testimony describing appellant's idea of an "open marriage." *See* TEX. R. APP. P. 33.1; *Coble,* 330 S.W.3d at 282 n.82.[10] Further, Black-Pace's and Parker's defecation testimony was similar to the unobjected-to testimony of the state's psychological expert, Dr. Lawrence Abrams. *See id.* Abrams had been assigned by the family court to evaluate Farah, appellant, and their children and make a custody recommendation as part of the divorce proceedings. Based on his interviews with Farah and appellant about the masochistic sexual behaviors that Farah had described, he formed the opinion that they had a "pretty sick relationship." Appellant was "into eating [Farah's] def[e]cation, swallowing her urine," and "other aspects of masochistic sexual behavior," such as having her step on his face and throat, and Farah went along with it for some time. Abrams testified that this was the most extreme sexual deviancy that he had seen for any one couple.

We are not persuaded that the trial court abused its discretion by admitting Black-Pace's

---

[10] To the extent that Black-Pace's testimony was arguably dissimilar because it mentioned appellant's desire to tie up his wife or to be tied up during sex, its admission, even if erroneous, would have been harmless in light of the other evidence of appellant's sexual deviance. *See* TEX. R. APP. P. 44.2(b); *see also Coble,* 330 S.W.3d at 286 n.89 (erroneous admission of particular future-dangerousness evidence was harmless in light of ample additional future-dangerousness evidence).

and Parker's testimony. Their testimony differed from Abrams's in one important respect: they specifically identified appellant, alone, as the source of their information, whereas Abrams generally referred to interviews with Farah and appellant. Thus, Black-Pace's and Parker's testimony confirmed that Farah's allegations were true.

Under the defense's theory, appellant killed Farah because he was afraid of losing his children to a woman who had falsely accused him, under oath, of extreme sexual deviance in order to gain an advantage in the custody proceedings. Under the state's theory, appellant had disclosed this deviance to Farah and had pressured her to act on it, but he was willing to kill her in order to prevent her from embarrassing him. As such, Black-Pace's and Parker's testimony informed the jury of appellant's state of mind, character, and, ultimately, his future dangerousness. *See Davis v. State,* 329 S.W.3d 798, 821 (Tex. Crim. App. 2010); *see also Williams v. State,* 273 S.W.3d 200, 220 (Tex. Crim. App. 2008).

### B. Telephone Conversations

Appellant also complains about the admission of his telephone conversations with Gomez.[11] He identifies four statements that he made during these conversations, asserting that they are unduly prejudicial and that they reveal "deviant sexual notions" that "are not accepted norms in Harris County, Texas." He argues that their admission violated Texas Rules of

---

[11] While in jail during the 2009 trial, appellant made several collect telephone calls to Betsy Gomez. Parts of their telephone conversations were played for the jury. In them, appellant frequently addressed Gomez as "Mrs. Fratta," they told each other how much they loved each other and made plans to marry, and their conversations were often sexually suggestive. Appellant joked that he had masturbated five times while looking at the photographs that Gomez had sent him, and he asked her to send more. Appellant told Gomez that she was his "dream girl" and that she would be his "trophy" when he got out of prison. They discussed ways that Gomez could modify a tattoo on her bottom that included the name of a former boyfriend. Appellant requested pictures of the tattoo and of Gomez's bare bottom, saying that prison regulations would allow him to have such pictures as long as they did not show her anus. Gomez said that she wanted to get a new tattoo for appellant. Appellant talked about starting his own political party, and Gomez volunteered to look into ways to set up a web site to post appellant's writings and raise money.

Evidence 401, 402, and 403 because they are highly offensive without being relevant to the questions of whether appellant is likely to commit a criminal act of violence in the future and whether there is a sufficient mitigating circumstance to warrant a life sentence.

To the extent that appellant intends to single out particular statements in these conversations for a separate analysis on appeal, he has waived error because he did not single out any particular statements for objection at trial. *See Roberts v. State,* 220 S.W.3d 521, 532 (Tex. Crim. App. 2007) (attack on victim impact testimony in general did not place the trial court on notice that appellant would find particular testimony objectionable); *Ladd,* 3 S.W.3d at 572 (trial court was not required, in the face of a global objection, to sift through an exhibit and segregate the admissible portions from the inadmissible portions).

The telephone conversations at issue were admitted during the state's rebuttal at the punishment phase. Appellant had cross-examined Abrams about the possibility that the results of psychological tests dating from 1984 and 1996 had become inaccurate by the time of the 2009 trial because a person could change over time, and Abrams acknowledged that possibility. Additionally, during the defense's case-in-chief, employees of TDCJ testified about appellant's good disciplinary history and periodic mental-health evaluations that indicated that he was not a danger to himself or others while in prison.

The telephone conversations rebutted appellant's argument that he had changed from the times of the psychological tests and the commission of the offense, such that he would not be a future danger if he received a life sentence. *See, e.g., Davis,* 329 S.W.3d at 821 (it was within the zone of reasonable disagreement that jokes Davis told his brother during a phone conversation while incarcerated were indicative of his character, including his attitude toward

women, and thus relevant to determining his future dangerousness and to rebut his claims of rehabilitation). In addition, these conversations demonstrated that, even while he was incarcerated, appellant was able to befriend people outside of prison and persuade them to do things for him. The trial court did not abuse its discretion by admitting this evidence at the punishment phase. Points of error twenty-eight and twenty-nine are overruled.

## Constitutionality of Sentencing Scheme

In point of error thirty-two, appellant asserts that the capital-murder sentencing scheme is unconstitutional because this Court does not conduct a meaningful appellate review of the special issues that are determinative of the death penalty. He refers to this Court's refusal to conduct a factual sufficiency analysis of the future-dangerousness question and to conduct any review of the mitigation question. Appellant acknowledges that we have rejected similar claims. *See, e.g., Conner v. State,* 67 S.W.3d 192, 203 (Tex. Crim. App. 2001); *Renteria v. State,* 206 S.W.3d 689, 707 (Tex. Crim. App. 2006); *Martinez,* 327 S.W.3d at 730 (citing *Brooks v. State,* 323 S.W.3d 893, 912 (Tex. Crim. App. 2010)). Appellant's assertion that the Constitution requires meaningful appellate review of the "'selective decision' of who dies" does not persuade us to reconsider our prior decisions. Point of error thirty-two is overruled.

We affirm the judgment of the trial court.


Delivered: October 5, 2011
Do Not Publish